Filed 4/13/23  In re K.E. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| In re K.E., a Person Coming Under the Juvenile Court Law. | D081256 |
|---|---|
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.S.,<br><br>Defendant and Appellant. | (Super. Ct. No. J520960) |


APPEAL from an order of the Superior Court of San Diego County, Margie G. Woods, Judge.  Affirmed.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Months-old K.E. became a dependent of the juvenile court as a result of recurring domestic violence perpetrated by D.E.[1] against her mother, K.S. (Mother), which violence at times placed K.E. in harm's way. At the six-month review hearing, the juvenile court ordered K.E. remain in out-of-home care. It found that Mother had not yet demonstrated substantive progress on her court-ordered treatment programs to protect K.E. from domestic violence and thus returning the child to Mother posed a substantial risk of detriment to the child's safety. On appeal, Mother contends the court's detriment finding was not supported by substantial evidence. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Referrals of Child Abuse or Neglect of K.E.*

The San Diego County Health and Human Services Agency (Agency) received three referrals for child abuse or neglect of K.E. as a result of domestic violence between Mother and Father. The reports revealed the following about K.E. and the family.

In September 2021, Mother and Father had an argument over money outside Mother's home. Father wanted an EBT (electronic benefit transfer) card and when Mother did not give it to him, Father "snatched" two-month old K.E. from Mother's arms. Father held K.E. with one arm and "was being 'rough.'" At one point, Father held the baby over his head without head or neck support. And when the maternal uncle and maternal cousin tried to "deescalate" the situation and get Father to leave, Father told them, "I'm

_____

1       D.E. is not a party to this appeal and refused to participate in the dependency proceedings. Although he denied paternity and is not listed on K.E.'s birth certificate as the father, Mother claimed he is K.E.'s biological father. For purposes of this opinion, we refer to D.E. as Father.

going to drop the baby if you touch me." He continued to warn them saying, "I'm going to drop the fucking baby." Although Father was "not intentionally shak[ing] or try[ing] to harm" the baby, Mother told the Agency she "felt the baby was unsafe" and that K.E. "was shaking back and forth because [Father] was holding her with one arm." When Mother tried to call the police on her iPad, Father broke it. Father eventually handed K.E. to Mother's uncle, and left before the police arrived.

After the first referral, Mother told the Agency she had been in a relationship with Father for six years and "they had 'no issues until recently.' " She reported there was one previous "incident" when she was pregnant with K.E., which resulted in her leaving Father for five months until K.E. was born. When the Agency spoke with Father, he "spoke using profanities," and "with [an] elevated volume and forceful tone," and he "often spoke of [M]other in predominantly negative terms." Father blamed Mother for any "child safety" issues, and showed the social worker text messages Mother sent Father, telling him she left California for Texas with K.E. "to avoid CWS" (child welfare services).

The second referral came in December 2021. The reporting party stated there was a history of domestic violence between Mother and Father, and K.E. "is always used as a pawn." But, according to the reporting party, Mother is "protective" of Father. In a recent incident that December, Father and Mother were arguing at a gas station at 1:00 a.m. While the parents argued, K.E. was "out in the cold and rain and ended up with a very bad diaper rash and bronchitis." Father was making threats to hurt K.E., and then took the baby and left Mother at the gas station. After this incident, Mother obtained a temporary restraining order (TRO) against Father, on December 17, 2021. In retaliation, Father went to Mother's home with K.E.'s

3

car seat "cut up" and other belongings of Mother's "destroyed." After the TRO was issued, Father returned K.E. to Mother. The reporting party also stated Father recently slapped Mother in the face leaving a mark.

Following the second referral, the social worker spoke with Mother in January 2022. Mother denied any physical altercation had taken place at the gas station and claimed K.E.'s rash and cold was due to Mother being sick, and not from the baby being outside late at night. Mother had a black eye when she spoke with the social worker. She denied Father hit her, and claimed she had gotten the bruise from a woman during a fight, although she did not know the woman or why the fight had occurred. She also explained that Father dropped off K.E.'s car seat but the "fabric was already cut." Mother did tell the social worker she had a new phone because Father broke the one she had. She also claimed the TRO was never served, even though law enforcement records showed the TRO was served on December 20, 2021. Mother told the Agency she did not need or want a restraining order, "as she denied any domestic violence" had occurred.

The third referral came in February 2022, when K.E. was six months old. Mother's relatives had received a video from Father, which the social worker watched. In the video, Mother was seen holding K.E., while " 'huddling up' on the floor, and facing toward the wall of what appeared to be a hotel hallway." Father is heard threatening "to shoot and kill" Mother's 16-year-old brother. He was cursing into the camera, using profanities to refer to Mother and the baby. He stated he was "pimp[ing] hoes" and "pimping" out Mother, as he was spreading around a large amount of cash on the floor. Mother appeared "in distress," although it could not be seen on the video whether she or K.E. were physically hurt.

4

In February 2022, the social worker spoke to the maternal grandmother, who reported "[F]ather is a threat to anyone who wants to be around" Mother. Although Father is not allowed in the house, Mother has brought him in at odd hours "without anyone's knowledge." The maternal grandmother reported Mother had multiple black eyes in the past and Mother has told her Father hit her. Father would destroy Mother's things when he gets angry and had destroyed her car, table, and multiple phones. Mother told the maternal grandmother that Father has threatened to hurt K.E. and Mother "many times." The social worker also spoke to the maternal aunt, who reported the family had tried to help Mother recognize the domestic violence, but Mother continued to return to Father and cut off communication with her family when they tried to help her. The family has had "sporadic" contact with Mother because Father has broken "many" of Mother's phones and Mother does not tell them she is with Father, or her and the baby's whereabouts.

## II.

### *Dependency Proceedings*

A.    *Petition and Detention Hearing*

On February 16, 2022, the Agency filed a dependency petition on behalf of K.E. pursuant to Welfare and Institutions Code[2] section 300, subdivision (b), and requested a protective custody warrant pursuant to section 340, subdivision (a). The Agency alleged K.E. was "periodically exposed to violent confrontations" between Mother and Father. And although the parents have a history of domestic violence, they have not participated in any treatment and continue to have contact with one another, "all of which place[d] [K.E.] at

---

[2]    All further undesignated statutory references are to the Welfare and Institutions Code.

5

substantial risk of serious physical harm." The juvenile court issued the protective custody warrant the same day.

At the initial detention hearing on February 17, 2022, the juvenile court granted Mother's request to have K.E. remain in her care pending the continued hearing the next day, over the Agency's objection. At the hearing the next day, the Agency renewed its request for out-of-home detention on the basis that a maternal relative disclosed Mother intended to take K.E. to meet with Father following a meeting with the Agency. The court found the Agency had made a prima facie showing in support of the petition and ordered K.E. detained out of Mother's care. It ordered the Agency to provide Mother with voluntary reunification services and liberal supervised visits. On February 22, K.E. was placed in the home of S.J., her maternal great aunt (Maternal Great Aunt), where she remained until the November 2022 six-month review hearing at issue in this appeal.

Three days after K.E. was placed with Maternal Great Aunt, Mother emailed the Agency a response to the petition and its detention report, asserting "[t]he petition was written with assumptions based off accusations from incredible sources." Mother reiterated she was not afraid of Father; she did not think he would harm K.E.; and she did not think a restraining order was necessary because she did not want to interfere with Father's visitation with K.E. She also informed the Agency she was pregnant with Father's second child.

B.    *Jurisdiction and Disposition Hearing*

At the contested jurisdictional and dispositional hearing in April 2022, the juvenile court admitted into evidence the Agency's jurisdiction and disposition report and addendum report with an attached intake report by a

6

family support clinician from Community Services for Families (CSF), and a stipulated statement from Mother's domestic violence advocate.

The CSF clinician reported Mother denied she was being "trafficked" by Father, but said that before K.E. was born she "used to do things to get money," without specifying what those "things" were. Mother was frustrated because she saw no "grounds" for removing K.E. from her custody. She further claimed reports of domestic violence between her and Father were "not accurate." She admitted Father had broken her phones, tablet, and radio in the past but denied he was "ever physical" with her. Mother also stated she was not worried Father would hurt her because he had "self-control." She expressed sympathy for Father's past traumas and the CSF clinician opined that she "use[d] those as excuses for his behaviors." Mother did acknowledge her continued exposure to domestic violence could impact her and K.E.'s well-being.

The Agency continued to recommend that K.E. remain in out-of-home placement and that Mother receive reunification services. The Agency acknowledged Mother was participating in voluntary services, visiting K.E. regularly, and maintaining contact with the Agency. But it was concerned that Mother remained in denial of the domestic violence between her and Father, and failed to acknowledge the harmful impact that exposure to domestic violence had on K.E. The Agency was also concerned by Mother's statement that she planned to be in a relationship with Father in the future. The Agency was worried Father "will continue to threaten to seriously hurt" Mother and K.E., and that Mother will continue to bring K.E. around Father despite prior counseling on her responsibility to protect K.E., and this showed she was "unable and unwilling" to protect K.E. from harm.

Mother's domestic violence advocate had been working with Mother on a weekly basis for a little over a month at the time of the hearing, and stated she "want[ed] to do everything [she] can to advocate" for Mother. The advocate explained Mother "ha[d] been working so extremely hard to get [K.E.] back," and that she has secured housing, furniture, food, and household items to provide for K.E. and her expectant child. Mother had also enrolled in therapy and was meeting with the advocate on a weekly basis "regarding the domestic violence incident." In the advocate's opinion, Mother "has gone above and beyond to prove . . . she is more than ready to have [K.E.] back in her care."

The juvenile court found the allegations in the petition to be true and took jurisdiction over K.E. pursuant to section 300, subdivision (b). The court removed K.E. from Mother's custody, finding by clear and convincing evidence that removal was appropriate under section 361, subdivision (c)(1), because there would be "substantial danger to the physical health, safety, protection, or physical or emotional well-being" of K.E. if she were returned to Mother.[3] It ordered Mother to "participate regularly and make substantive progress" in the reunification plan, which included therapy to address domestic violence and the effect on children, a domestic violence victim's program, and parenting education. In its ruling, the court stated:

> "I do appreciate the efforts that have been made and the progress that is starting to be made on behalf of the mother. Acknowledging that there's domestic violence is a good first step. But beyond acknowledging domestic violence, what the court needs to see is acknowledging the effect that violence could have on a child, even if a child is that little. And that takes time.

---

[3] Mother appealed the juvenile court's jurisdictional and dispositional orders, but this court dismissed the appeal on June 6, 2022 after Mother's appellate counsel filed a brief indicating there were no arguable issues.

8

Because domestic violence doesn't just—especially when you have a history this long—just doesn't get cured. it's something that requires a lot of therapy and a lot of insight to understand the scope of it."

The juvenile court also ordered "very liberal" supervised visits and gave the Agency discretion to expand to unsupervised visits, overnight stays, and longer trial visits. In doing so, the court told Mother the case "could head in that direction really quickly," if Mother resolved the "two main issues": (1) "[U]nderstanding the way domestic violence is a poison that spreads throughout the house. It's not just between the two people that are having the problem. Everyone involved and around is affected by it. . . . And how to avoid people who bring that into your life." And (2), "[M]aking sure that relationship is truly severed, or repaired, or whatever needs to happen between you and the father, that everyone feels comfortable that the child's not going to be exposed to that again, that he's not going to be lurking around the corner and back into your life."

C.    *Contested Six-Month Review Hearing*

At the contested six-month review hearing in November 2022, the juvenile court admitted into evidence the Agency's October 2022 status review report and November 2022 addendum report, which contained a domestic violence quarterly report. The Agency continued to recommend that K.E. remain placed in out-of-home care with Maternal Great Aunt, that Mother continue to receive reunification services and supervised visits, with the Agency's continuing discretion to expand visitations. Mother did not present an affirmative evidence and did not cross-examine the available social worker. She requested that K.E. be returned to her custody.

According to the status review report, Maternal Great Aunt went over to pick up Mother from her apartment for a visit with K.E. on June 15, 2022. Mother came to the car, got K.E., and tried to take K.E. back into Mother's

home. When Maternal Great Aunt followed Mother to her front door, Mother yelled to her "roommate . . . to warn her about [Maternal Great Aunt] coming into the home." When she got to the front door, Maternal Great Aunt could hear Father's voice. Just then, K.E. heard Father's voice and started to cry, "hugg[ing] [Maternal Great Aunt] so tight that she had her nails in [Maternal Great Aunt's] neck." According to Maternal Great Aunt, who was not permitted inside the house, K.E. was "terrified" when she heard Father's voice. Mother denied Father was in the home.

Mother was reported to be currently participating in individual therapy, a domestic violence victim support group, and parenting education. Mother told the Agency she had one class left in her parenting education, had not started on her individual therapy, even though the therapist called her several times. Mother told the Agency "on multiple occasions that she would prefer not to attend the domestic violence group program as she feels she is unable to relate" to the other participants. The domestic violence quarterly report stated Mother's participation was "inconsistent" because she attended 7 out of 12 classes. She also had not turned in any homework assignment. The provider assessed Mother's "overall progress" as "below expectation at this time."

Mother denied ever experiencing domestic violence with Father, reporting instead that he had a "temper" and "they would walk away to cool off." Mother claimed Father's "behaviors" were due to his grief and depression following his grandfather's passing in 2019. She told the Agency the video of Father threatening her, K.E., and maternal family members was "false and did not occur." The Agency found Mother's minimization of her domestic violence experience "highly concerning." It was also concerned that

Father may still be involved in Mother's life based on Maternal Great Aunt's report of the June 2022 visit.

At the review hearing, the Agency acknowledged Mother's visitations with K.E. were "very good," but remained concerned Mother still had "a very big lack of insight" into the domestic violence issue and she continued to minimize the protective issues. The Agency stated that it "would like to see more progress and insight" from Mother on the protective issues.

Mother's counsel argued Mother "has made very good progress" in her domestic violence class. Mother had given birth to Father's second child, G.E., in July 2022, and her counsel argued that if it was "safe" for the newborn to be in Mother's care, K.E. would be safe in her care as well. Counsel emphasized that Mother was "more than halfway" through her domestic violence classes, that she had made "great progress" and "*appear[ed]*" to be staying away from Father. (Italics added.)

Here, the juvenile court interjected Mother's counsel to underscore, "it's not the question of [Mother] caring for her child and being able to provide care as much as the question of whether or not she can see what took place that was harmful to her child when there was violence taking place against her by another adult." The court stressed, in order to protect K.E. from domestic violence, it was critical for Mother "to internalize what's happened to confirm[ ] that she does not want to and will not return to a relationship that's violent, that could be one that places, not just her newborn, but *this child before the court who is a dependent*, in danger." (Italics added.) On this issue, the court found the domestic violence quarterly report to be "very important," and noted Mother's overall progress was rated "below expectation." Her participation was "inconsistent," having attended only 7 out of 12 classes, and she had not turned in any homework.

At this stage, the juvenile court determined the return of K.E. to Mother's custody "would create a substantial risk of detriment to the child's physical or emotional well-being," and continued K.E.'s placement in the approved home of Maternal Great Aunt. Because Maternal Great Aunt was moving to Texas, and the court found it was in K.E.'s best interest to stay in Maternal Great Aunt's care, the court authorized the Agency to evaluate an ICPC (Interstate Compact on the Placement of Children) to facilitate K.E.'s placement in Texas. The court granted Mother liberal unsupervised visitation, and stated that it expects the Agency to "maintain a relationship, albeit, more long distance for the time being" between Mother and K.E. The court also stated that with good progress, it expected to see Mother to obtain "longer visits" and to "move forward to regaining custody [of K.E.] in the near future."

DISCUSSION

Mother challenges the juvenile court's finding at the six-month review hearing that it would be detrimental to return K.E. to her custody as lacking substantial evidence. We disagree. On this record, there was substantial evidence to support the juvenile court's finding of detriment.

When the juvenile court has found jurisdiction under section 300, it may remove a child from a parent pursuant to section 361 at a *dispositional hearing* only if it finds by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents." (§ 361, subd. (c)(1); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248–249

12

(*Cynthia D.*) ["At the dispositional hearing, the standard of proof for removal from a custodial parent is clear and convincing evidence."].)

At the six-month review hearing, there is a statutory presumption that the child will be returned to parental custody "unless the court finds, by a *preponderance of the evidence*, that the return of the child to [his or her] parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1); *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.) The Agency, not the parent, bears the burden of establishing that detriment. (*Cynthia D., supra*, 5 Cal.4th at pp. 248–249.) Proof by a preponderance standard at this stage sufficiently protects a parent's due process rights because, as our Supreme Court has explained, the statutory scheme requires the juvenile court to have previously made a finding of detriment by clear and convincing evidence. (*Cynthia D.*, at pp. 253–256.)

"In evaluating detriment, the juvenile court *must* consider the extent to which the parent participated in reunification services" and "efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400, italics added.) Indeed, the failure of a parent "to participate regularly and make substantive progress in court-ordered treatment programs *shall be prima facie evidence that return would be detrimental.*" (§ 366.21, subd. (e)(1), italics added.) Moreover, the juvenile court "shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which . . . they availed . . . themselves of services provided." (§ 366.21, subd. (e)(1).)

A juvenile court may find it is detrimental to return the child to the parent even when the parent complies with the reunification case plan. (See

13

*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–711 [concluding that, although the mother had completed her program, reports by mental health and medical professionals and social worker supported the finding that returning the minors to the mother would be a substantial detriment to them]; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 [holding that therapy attendance and visiting the children were not determinative, and that "[t]he court must also consider the parents' progress and their capacity to meet the objectives of the plan"]; *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221 ["a finding that improvements in [a] parent[']s circumstances outweigh the failures during reunification does not guarantee return of the child to the parents"].) The juvenile court may consider the parent's past conduct as well as present circumstances (*In re Troy D.* (1989) 215 Cal.App.3d 889, 900), and is permitted to consider a parent's denial of the protective issues when evaluating detriment in returning a child to parental custody (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865–868 (*Georgeanne G.*)). "It is for the [juvenile] court to weigh this evidence against the evidence of the parents' efforts, accomplishments, and failures during the reunification period." (*In re Jonathan R.*, at p. 1221.)

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination." (*Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 864–865; see *In re Mary B.*, *supra*, 218 Cal.App.4th at p. 1483.) " ' "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " [Citation.] " ' "We do not reweigh the evidence

14

or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Here, the juvenile court found it would be detrimental to K.E. to return her to Mother's custody at the six-month review hearing because Mother had not made sufficient progress on her reunification plan and had not shown the necessary insight to the domestic violence that led to K.E.'s removal. Substantial evidence supported the court's findings.

The court-ordered reunification plan identified Father as the primary danger to K.E.'s safety and well-being. It outlined four objectives for Mother to accomplish. First, she is to "[p]rotect [K.E.] from emotional harm." Second, she is to "[d]evelop positive support systems with friends and family." Third, she is to "[t]ake appropriate action to avoid being a victim of further domestic violence." And fourth, she is to "[d]evelop and use a specific domestic violence Relapse Prevention Plan for herself." Her responsibilities also included participating in general counseling, a domestic violence program, and parenting education.

The record before the juvenile court at the time of the six-month review hearing revealed Mother's progress in the court-ordered domestic violence program was "below expectation." Although Mother self-reported that she was "about half way through" her domestic violence classes, the most recent report from the provider showed Mother attended only 7 of the 12 sessions between May 13, 2022 and August 17, 2022. Mother provided an excuse for one absence (the birth of her second child) in August 2022. But as the juvenile court and the Agency noted, attendance was not the primary issue. The provider rated Mother as a "3" on a rating scale of 0 to 5, which correlated to "Sometimes," in the areas of "Engagement" and "Awareness of

15

Protective Issues." Mother's failure to participate regularly and to make substantive progress in her treatment programs is prima facie evidence that returning K.E. to her custody would be detrimental. (§ 366.21, subd. (e)(1).)

It is clear that Mother's poor performance in her court-ordered treatment programs reflected she had not yet accepted that she was a victim of domestic violence by the father of her child. And consequently, she failed to recognize K.E.'s exposure to that violence also placed K.E. in danger. Throughout services, Mother denied or minimized Father's violence. Mother initially described Father's violence as "arguments" and excused Father's conduct in September 2021, when he held two-month old K.E. in a "rough" and unsafe manner, as Father having "a bad day." She told the Agency several times "she would prefer not to attend the domestic violence group program" and felt she was "unable to relate" to the attendees, because she denied experiencing domestic violence. Mother also asserted the video taken of Father threatening her, K.E., and the maternal family members was "false and did not occur," despite the fact the incident was captured on video and verified by the social worker's viewing of the video.

Failing to recognize the danger Father presented to her and K.E., Mother continued to expose K.E. to Father. Approximately five months before the six-month review hearing, and despite the counseling and services she had received to gain insight into the protective issues, Mother brought K.E. into her home when, according to Maternal Great Aunt, Father was present. The surrounding circumstances supported the inference that Mother attempted to conceal Father's presence from Maternal Great Aunt. Moreover, the harm to K.E. from the repeated exposure to her parents' domestic violence was evident in K.E.'s crying and clinging to Maternal Great Aunt's neck upon hearing Father's voice. Mother's denial of the protective

16

issues further supported the juvenile court's finding there is detriment in returning K.E. to her custody. (See *Georgeanne G.*, *supra,* 53 Cal.App.5th at pp. 865–868).

It is Mother's burden to affirmatively demonstrate the juvenile court's order was not supported by substantial evidence (*In re M.S.* (2019) 41 Cal.App.5th 568, 581), but her arguments on appeal—that "the Agency's characterization of Mother's parenting of G.E. was overwhelmingly positive, and no concerns were reported," there were no "allegations Mother was even having contact with Father," and she substantially complied with the case plan—are not adequate to carry that burden.

First, we note Mother's briefing on appeal ignores essential, material facts that *do* support the court's order, and under a substantial evidence review, we could very well treat her claim of error as forfeited. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 402 ["An appellant must fairly set forth all the significant facts, not just those beneficial to the appellant."].) Second, Mother's arguments overlook that under the substantial evidence standard of review, we do not disturb the court's findings if it is supported by substantial evidence, "even though substantial evidence to the contrary also exists and the [juvenile] court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 230.)

Lastly, we do not agree with Mother that the "dispositive factor" in determining whether K.E. could safely return to Mother's custody was the asserted fact that Mother was able to safely care for her second child, G.E. This argument again fails to acknowledge that even if the juvenile court *might* have reached a different result had it believed Mother's evidence, we look for whether substantial evidence supports the decision the court *did* make. (See *In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 230.)

17

We are also not persuaded by Mother's argument. Mother asserts that because K.E. and G.E. are "similarly situated"—they share the same father, are close in age, and both are girls—the juvenile court's reasoning that Mother failed to demonstrate the necessary insight to protect K.E. from domestic violence "flies in the face of any notions of logic or reason when considering that Mother safely parented G.E., who remained exclusively in her care and custody."[4] But, as the juvenile court noted in rejecting the same argument, K.E. is a dependent of the court, while G.E. is not, and the issue is whether or not Mother can protect "*this child before the court who is a dependent*" from the danger of Father's violence. (Italics added.)

K.E. became a dependent of the court because of her repeated exposure to domestic violence between her parents, which at times placed her directly in harm's way. And it was Mother's failure to make substantive progress on her court-ordered treatment programs and to demonstrate insight into the issues that placed K.E. in danger that is relevant to the court's detriment findings. These facts are substantial evidence to support the juvenile court's detriment finding at the six-month review hearing. (§ 366.21, subd. (e)(1); *Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 865–869.)

---

[4] Mother also asserts the juvenile court's reasoning that returning K.E. to Mother's custody was not in K.E.'s best interest because "it would be difficult for Mother to care for two young children" was legally "flawed" because this not the standard for detriment under section 366.21, subdivision (e). We reject the assertion because it relies on a select quotation of the court's statement of reasons. Following the court's comment that caring for "two infants at this time . . . would be very a very demanding and challenging period" for Mother, the court went on to a lengthier discussion of Mother's progress (or lack thereof) in addressing the harm of domestic violence on K.E.

## DISPOSITION

The juvenile court's order of November 17, 2022 is affirmed.


DO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.